1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

MANUEL SHOTWELL,              )     1:04-CV-6496 LJO JMD HC
                              )
          Petitioner,         )
                              )     FINDINGS AND RECOMMENDATION
     v.                       )     REGARDING PETITION FOR WRIT OF
                              )     HABEAS CORPUS
                              )
MIKE EVANS,                   )
                              )
          Respondent.         )
_____)     OBJECTIONS DUE WITHIN THIRTY DAYS

     Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### BACKGROUND

     On May 2, 2002, Petitioner was convicted of conspiracy to commit murder (Cal. Penal Code §§ 182(a)(1), 187(a)) and of attempted premeditated murder (Cal. Penal Code §§ 187(a), 664). (Answer at 2.) The jury also found that Petitioner caused great bodily injury by personally discharging a firearm (Cal. Penal Code § 12022.53(d)). (Id.) Petitioner was sentenced to 25 years to life for the conspiracy and to 25 years to life for its firearm enhancement. (Id.) He received stayed terms of 15 years to life for the attempted murder and 25 years to life for its firearm enhancement. (Id.)

     Petitioner filed an appeal to the California Court of Appeal. On November 13, 2003, the court remanded the case to amend the abstract of judgment to state a stayed term of life with the

possibility of parole on the attempted murder count.  The court affirmed the remainder of Petitioner's conviction.  (Excerpts of Record, Ex. 1; Answer at 2.)

Petitioner petitioned the California Supreme Court for review.  On January 28, 2004, the court denied review.  (Lod. Docs. 5-6.)

On May 4, 2004, Petitioner filed a petition for writ of habeas corpus in the United States District Court, Northern District of California.  On November 2, 2004, the petition was transferred to this Court.  (Answer at 2.)

On January 10, 2005, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (Lod. Doc. 7.)  On June 27, 2005, this Court stayed the federal petition pending resolution of the state petition.  On January 18, 2006, the California Supreme Court denied the state petition without comment.  (Lod. Doc. 8; Answer at 3.)

On April 12, 2006, this Court lifted the stay of the federal petition.  On June 29, 2006, Petitioner filed the instant amended petition.  (Answer at 3.)  The amended petition sets forth the following five claims for relief: 1) erroneous jury instruction concerning elements of conspiracy violated due process; 2) instructing the jury with CALJIC 17.41.1 violated due process and right to trial by jury; 3) ineffective assistance of trial counsel based on failure to request competency hearing and failure to investigate mental disorder; 4) Kern County Public Defender violated Petitioner's rights by simultaneously representing him and Donmac Roberts; and 5) ineffective assistance of trial counsel based on failure to present witnesses to support alibi defense.

On September 19, 2006, Respondent filed an answer to the petition.

On January 21, 2007, Petitioner filed a traverse to the answer.

On March 14, 2008, the Court ordered Respondent to supplement the record with an affidavit from trial counsel describing the investigation he made into Petitioner's mental state and explaining his decision to forego a mental defense.

On May 6, 2008, Respondent filed a declaration from trial counsel.

On May 27, 2008, Petitioner filed a response to the declaration and a request seeking to further expand the record with three letters.

On June 26, 2008, the Court ordered an evidentiary hearing.  (Doc. 49).  The Court conducted

1   the evidentiary hearing on April 27, 2009.

2           Petitioner filed a post-evidentiary hearing brief on July 17, 2009.  (Doc. 64).  Respondent

3   filed its post-evidentiary hearing brief on September 3, 2009. (Doc. 67).

4                                      **Factual Background[1]**

5   The November 27, 2001 Welch Homicide

6           Francisco King was a childhood friend of Petitioner and Tommy Welch.  King
    also knew Michael James because they went to high school together.  On November
7   27, 2001, King, Welch, and Petitioner took Welch's white car to an address on Houser
    Street in Bakersfield for repairs.  After dropping the car off, the three men went to
8   King's house, also on Houser Street.  King's girlfriend and daughter were at the house,
    but King did not recall if James was present.  Shortly after arriving at King's house,
9   Welch left.  King then heard six or seven shots and "hit the ground."  When he got up,
    he went outside with Petitioner and saw Welch lying in the street.  King saw someone
10  running down the alley, but could not identify the person.  King went back into the
    house, got some blankets, and went back outside to help Welch.  Petitioner was
11  crying.

12          Just after 4:00 p.m. on November 27, 2001, Bakersfield Police Detective
    Dennis McBride and his partner were on patrol when they heard the call about the
13  Welch shooting.  They immediately went to the scene.  McBride interviewed
    witnesses and came to believe that Donmac Roberts was the person who shot Welch.
14  McBride also saw a car, which registration records showed was a 1986 Ford
    registered to Welch, parked in J.T. Grandson's front yard.

15
            Several times on November 27, the police came to Christopher Davis's house
16  and asked him about Donmac Roberts, who was a suspect in Welch's murder.  At the
    time, Davis lived with his brother, William Watson, and his mother.  Roberts, who
17  Davis's grandmother had adopted and Davis considered to be his adopted brother, had
    lived at Davis's house until he got married in 2000.  Davis called Roberts his "little
18  brother."  After that, Roberts only stayed there occasionally, in the den, when he had
    marital problems.  Davis's mother's bedroom was at the back of the house, while the
19  bedrooms of Davis and Watson were near the front door.  In addition to the front
    door, the den had a sliding glass door that opened to the outside.
20
            Davis testified he told police that on November 27, Roberts had been at his
21  house with him and a friend, playing video games and listening to music, until about
    4:00 p.m., when Roberts walked north on a nearby side street.  Davis later found out
22  that Roberts had been arrested that day.

23  The November 29, 2001 Davis Shooting

24          At 8:15 a.m. on November 29, 2001, Davis was lying in bed when he heard
    someone knocking on his window, banging on the front door, and calling his first
25  name.  When Davis yelled, "[W]ho is it?," someone said "it's Eddie L's."  Davis knew
    someone with that nickname, so he looked out his window and saw James, who went
26  by the nickname "Michael Do," and another person, whom he later realized was
    Petitioner.  James was facing Davis's window and wearing a Cowboys jacket with the

27

28
    _____
    [1] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of November 13,
    2003 and are presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1); Excerpts of Record, Ex. 1.

hood up, while Petitioner was knocking on the door and wearing all black with a coat.

Davis first met James a couple years before, when James came to Davis's house to get car parts from Roberts's car.  Since that time, Davis saw James periodically on the street, but they never talked.  Davis went to school with Petitioner's brother and knew Petitioner from playing basketball at the park.  Davis last saw Petitioner in the summer of 2001.  Davis did not have problems with either James or Petitioner before; he didn't really know James and knew Petitioner "quite a bit" from playing basketball and "knowing" Petitioner's brother.  According to Davis, Petitioner and Roberts were friends.

Davis thought they might want to ask him about the Welch murder and his brother, so he told them to wait, and he went to the front door.  When Davis opened the front door, no one was there.  Davis walked outside, turned to his right, and walked to the end of the porch toward the side yard. When Davis got to the end of the porch he saw James and Petitioner.  Davis thought they were talking to his brother Watson across the gate or fence.  Petitioner and James smiled, and said, "[W]hat's up, Chris?"  He replied, "[W]hat's up?"  Suddenly a mean look came across Petitioner's face; he raised a gun that he was holding at his side, aimed it at Davis's face, and started shooting.  A bullet hit the right side of Davis's neck, and he went into a state of shock.  As Petitioner continued shooting, Davis turned and went into the house "in a trance."  Davis was shot about eight times, including in the right shoulder and the right side of his chest.

As Davis re-entered his house and closed the door, he saw a hand with a gun following him into the house. Davis continued to close the door, and the hand moved back out of the house.  Davis shut and locked the door.  Watson walked in from the den, calling 911.  At trial, the tape of Watson's 911 call was played for the jury.  When the police arrived, Davis talked to an officer and told him who shot him.

About 8:00 a.m. on November 29, Maria Flores returned to her house on the same street as Davis's after dropping her children off at school.  About 15 minutes later she heard five shots and ran to her window.  She saw two people wearing black jackets run and get into a large, older white car parked in the alley in front of her house.  The car may have had a tan top, and one person may have gotten into the front seat while the other person got into the back seat.  The people were too far away for her to tell their gender or race.  The car left "real fast."  Later, Flores told police what she had seen.

Davis was taken to Kern Medical Center, where he told Bakersfield Police Officer Damon Youngblood that Petitioner was the person who shot him.  The audiotape of the interview was played for the jury, on which Davis states that Petitioner was the person who shot him and that "Michael Do" was also there.

The Investigation into the Davis Shooting

During Davis's three-week hospital stay, Detectives Charmley and McBride came and talked to him.  The detectives showed him pictures of James and Petitioner, and he identified them as the men who had shot him.  At trial, Davis admitted telling the detectives that he initially did not see the second person when he first looked out the window, but explained that he meant that while he saw the second person, he could not identify who the person was.  Davis assumed the person was Eddie L. because they called out that name.  It wasn't until he came out of the house and saw the second person that Davis realized it was Petitioner, not Eddie L.  Davis also denied telling the detectives that he thought something was wrong before he went to the door, and if he did not answer the door, Petitioner and James would have kicked it

in.

At about 5:50 p.m. on January 4, 2002, Las Vegas Metropolitan Police Officer Edward Reese was on duty when he stopped a white Ford LTD driven by James, with Petitioner as a passenger. The car was listed as a "felony vehicle" from Bakersfield for murder, with a Bakersfield police department telephone number. Petitioner and James told Officer Reese that they did not have identification cards, gave him false names, and told conflicting stories about where they had been staying. James could not give the criminal history of the name he had given Officer Reese. Officer Reese eventually learned the true identities of Petitioner and James by getting additional information from the Bakersfield police, including tattoo descriptions. Based on this information, Petitioner and James were taken to jail. While still at the scene of the stop, James admitted he had given a false name. Petitioner admitted he gave a false name after being booked into jail.

In January 2002, McBride and his partner drove to Las Vegas to interview Petitioner and James, and to look at the car that had been impounded. McBride recognized the car as the white one he had seen in J.T. Grandson's front yard that belonged to Welch.

Also in January 2002, McBride interviewed King at the Kern County jail. King told McBride that on November 27, 2001, he, his girlfriend or wife, their child, Welch, and James took Welch's car to J.T. Grandson's house for repairs. King said that as they were crossing the true street to return to his house, he saw a green van drive by with someone in it that he knew, and he was irritated that they did not stop to acknowledge him and his friends. After the van drove by, they went inside King's house. Shortly after Welch went outside to ride a skateboard, they heard gunshots. King told McBride that James covered King's child either while shots were being fired, or shortly thereafter. King also said that he and Petitioner then went outside.

At trial, King did not recall telling Detective McBride that James was with the group of people present at his house on November 27, 2001, and he denied telling McBride that James got on top of his daughter when the shots that killed Welch were fired, a green van drove by, or that he and Petitioner chased a green van in his girlfriend's car but were unable to catch it.

Petitioner's Defense

Petitioner testified in his own defense. In December 2000 he was walking out of a house when "some guys ran out of a [sic] alley and just started shooting." He sustained two gunshot wounds-two to his right leg and one across his left toes. Since the shooting, he always walks with a limp and uses a cane, and he has been unable to run, jump or play basketball. Petitioner admitted that in March 2001 he was arrested for and entered a plea to evading a police officer. He served a sentence in jail, and was released on August 17, 2001. He received medical treatment for his gunshot wounds for months, including plastic surgery while he was in jail. He showed the jury the scars from his wounds, including the places where two bullets remained in his leg.

Petitioner admitted he had known Davis for about 10 years, but denied staying at Davis's house or playing basketball with him. Petitioner testified that he was not friends with Davis, but he didn't "have anything against him." Petitioner testified he knew Roberts, who was his friend.

Petitioner moved to Fresno in August 2001, where he lived with his girlfriend,

Tonoma French. Petitioner was visiting Bakersfield for a Thanksgiving vacation at the time of the Welch shooting. He admitted that on November 27, 2001, he was with King and Welch during and after the time he left his car, a white 1986 Ford Crown Victoria, at J.T. Grandson's house to be repaired. The car was registered to Welch, who was Petitioner's nephew, but Petitioner claimed he owned the car. Petitioner testified he dropped the car off sometime between 2:00 and 4:00 p.m.

While the group was walking to King's house, King pointed out a green van that drove by, but Petitioner testified he did not see who was in the van. Petitioner was in King's house when he heard the shots that killed Welch, but he did not see the shooting. He initially ducked down in the house, but then went out on the porch and saw a person running and Welch lying on the street. Petitioner could not identify the person running away, but had heard rumors regarding who killed Welch. Petitioner was upset over the shooting. Petitioner testified King took a blanket to Welch, and denied the fleeing person got into a green van, or that he and King chased the van. Petitioner testified he had not seen Roberts recently, and was not aware of any problems between Welch and Roberts.

Petitioner testified that about an hour after the shooting, a friend named Shanetha, who came to the scene shortly after the shooting, took him to his parents' house in Bakersfield, and he told them their grandson had been killed. Petitioner picked up his car at about 6:00 p.m., after the police had left the scene, paid Grandson for the repair, and drove back to his home in Fresno. According to Petitioner, he did not come back to Bakersfield on November 29, 2001, nor did he participate in the Davis shooting.

Petitioner admitted he went to Las Vegas in December for a vacation, where he stayed at the house of his girlfriend, Denise, for a couple weeks. He testified he ran into James at the house of a mutual friend in Las Vegas only a few days before they were arrested. Petitioner claimed the last time he had seen James in Bakersfield was when they were incarcerated together in 2001. Petitioner testified he gave police a false name because he had a probation condition that he remain in California, and he also had outstanding warrants for restitution and traffic violations.

## Discussion

### I.     Jurisdiction and Venue

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

1   *Lindh v. Murphy*, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); *Jeffries v. Wood*, 114

2   F.3d 1484, 1499 (9th Cir. 1997), *quoting Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996),

3   *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320

4   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition

5   was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

6   **II.       Standard of Review**

7           This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

8   pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

9   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

10          The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

11  Penalty Act which became effective on April 24, 1996.  *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).

12  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of

13  the claim "resulted in a decision that was contrary to, or involved an unreasonable application of,

14  clearly established Federal law, as determined by the Supreme Court of the United States" or

15  "resulted in a decision that was based on an unreasonable determination of the facts in light of the

16  evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); *see Lockyer*, 538 U.S. at 70-

17  71; *see Williams*, 529 U.S. at 413.

18          As a threshold matter, this Court must "first decide what constitutes 'clearly established

19  Federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71,

20  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

21  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

22  of the relevant state-court decision." *Id.*, *quoting Williams*, 592 U.S. at 412. "In other words, 'clearly

23  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

24  the Supreme Court at the time the state court renders its decision." *Id.*

25          Finally, this Court must consider whether the state court's decision was "contrary to, or

26  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

27  *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

28  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

1   question of law or if the state court decides a case differently than [the] Court has on a set of

2   materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72.

3   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

4   identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

5   that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.

6       "[A] federal court may not issue the writ simply because the court concludes in its

7   independent judgment that the relevant state court decision applied clearly established federal law

8   erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  A

9   federal habeas court making the "unreasonable application" inquiry should ask whether the state

10  court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

11      Petitioner has the burden of establishing that the decision of the state court is contrary to or

12  involved an unreasonable application of United States Supreme Court precedent.  *Baylor v. Estelle*,

13  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

14  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

15  decision is objectively unreasonable.  *See Duhaime v. Ducharme,* 200 F.3d 597, 600-01 (9th Cir.

16  1999).

17      AEDPA requires federal habeas courts to give considerable deference to state court decisions.

18  The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and federal courts are

19  bound by a state's interpretation of its own laws. *Souch v. Schaivo,* 289 F.3d 616, 621 (9th Cir.

20  2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

21  **III.  Review of Petitioner's Claims**

22      **A.  Ground One**

23      Petitioner claims that the trial court gave jury instructions that erroneously suggested that the

24  overt act requirement of a conspiracy charge was satisfied by the agreement itself or by flight after

25  the crime.  Petitioner argues that the instructions therefore violated his due process rights because

26  they permitted his conviction without a finding that he committed an overt act in furtherance of the

27  conspiracy as required by California law.

28  ///

1    This claim was presented in an appeal to the California Court of Appeal, which affirmed the

2    relevant portion of the judgment on November 13, 2003.  (Excerpts of Record, Ex. 1.)  The issue was

3    then raised in a petition to the California Supreme Court, which summarily denied review.  (Lod.

4    Docs. 5-6.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to

5    have denied the claims presented for the same reasons stated in the opinion of the lower court.  *Ylst*

6    *v. Nunnemaker*, 501 U.S. 797, 803 (1991).  In rejecting Petitioner's claim, the Court of Appeal found

7    that, while the instructions were erroneous, the error in giving them was harmless because it was

8    clear from the jury's verdict that it found Petitioner had shot and injured Christopher Davis, which

9    satisfied the overt act requirement of the conspiracy charge.  (Excerpts of Record, Ex. 1 at 12-17.)

10    To obtain federal habeas relief on the basis of an incorrect jury instruction, a petitioner must

11    show more than that the instruction was undesirable, erroneous, or even universally condemned; the

12    question is whether the instruction by itself so infected the entire trial that the resulting conviction

13    violated due process.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).   "It is well established that the

14    instruction 'may not be judged in artificial isolation,' but must be considered in the context of the

15    instructions as a whole and the trial record."  *Id.*  Further, habeas relief based on trial error is only

16    available if the error had "substantial and injurious effect or influence in determining the jury's

17    verdict."  *Calderon v. Coleman*, 525 U.S. 141, 145 (1998); *Inthavong v. Lamarque*, 420 F.3d 1055,

18    1059 (9th Cir. 2005) ("To grant relief where a state court has determined that a constitutional error

19    was harmless, we must both determine (1) that the state court's decision was 'contrary to' or an

20    'unreasonable application' of Supreme Court harmless error precedent, and (2) that the petitioner

21    suffered prejudice under *Brecht* from the constitutional error.").

22    The state court's determination that the erroneous jury instructions were harmless was not

23    unreasonable.  The trial court instructed the jury in part as follows:

24

25    Conspiracy to commit murder is an agreement entered into between two or more
persons with the specific intent to agree to commit the crime of murder and with the
further specific intent to commit that murder followed by an overt act committed in
26    this state by one or more of the parties for the purpose of committing – accomplishing
the object of the agreement.  (RT 339.)

27

28    In order to find a defendant guilty of conspiracy, in addition to the proof of the
unlawful agreement and specific intent, there must be proof of the commission of at

1   least one of the acts alleged in the Information to be overt acts and that the act found
    to have been committed was an overt act.  (RT 340.)

2

3   In this case the defendants are charged with conspiracy to commit the public crimes of
    murder in count one.  It is alleged in count one that the following acts were committed
    in this state by one or more of the defendants and were overt acts and committed for

4   the purpose of furthering the object of the conspiracy.  Number three.  The defendants
    and/or conspirators, excuse me, and/or co-conspirators agreed to commit a retaliatory

5   murder against the murderer's family. . . . Ten.  The defendant Manuel Shotwell shot
    Christopher Davis in the neck and torso numerous times.  Eleven.  The defendants

6   fled the scene and entered Tommy Welch's vehicle.  (RT 344-45.)

7       The instructions as given did improperly suggest that the overt act element could be satisfied

8   based on the agreement itself or on Petitioner's flight after the crime.  *See* Cal. Penal Code § 184

9   ("No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within

10  this state to effect the object thereof."); *People v. Zamora*, 18 Cal.3d 538, 560 (1976) ("[A]cts

11  committed by conspirators subsequent to the completion of the crime which is the primary object of

12  a conspiracy cannot be deemed to be overt acts in furtherance of that conspiracy.").  However, the

13  jury's finding as to the firearm enhancement demonstrates that it found Petitioner "personally and

14  intentionally discharge[d] a firearm and proximately cause[d] great bodily injury."  Cal. Pen. Code §

15  12022.53(d).  The only factual basis on which the jury could have made such a finding is that

16  Petitioner shot and injured Christopher Davis.  Such a finding was sufficient to satisfy the overt act

17  requirement of the conspiracy charge.

18      **B.  Ground Two**

19      Petitioner argues that the use of CALJIC 17.41.1 violated due process and his right to trial by

20  jury because it unfairly curtails jury deliberations.  The instruction reads as follows:

21

22  The integrity of a trial requires that jurors, at all times during their deliberations,
    conduct themselves as required by these instructions.  Accordingly, should it occur

23  that any juror refuses to deliberate or expresses an intention to disregard the law or to
    decide the case based on penalty or punishment, or any other improper basis, it is the

24  obligation of the other jurors to immediately advise the Court of the situation.

25  (RT at 363.)

26      This claim was presented in an appeal to the California Court of Appeal, which affirmed the

27  relevant portion of the judgment on November 13, 2003.  (Excerpts of Record, Ex. 1.)  The issue was

28  then raised in a petition to the California Supreme Court, which summarily denied review.  (Lod.

Docs. 5-6.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. *Nunnemaker*, 501 U.S. at 803.

In rejecting Petitioner's claim, the Court of Appeal found that it was bound by the California Supreme Court's prior holding that the instruction did not violate any constitutional right.  (Excerpts of Record, Ex. 1 at 18.).  The state court's determination was not unreasonable because no Supreme Court case establishes that such an instruction violates any constitutional right.  *Brewer v. Hall*, 378 F.3d 952, 955-56 (9th Cir. 2004) ("It is clear, however, that the California appellate court's holding was not contrary to or an unreasonable application of clearly established Supreme Court precedent, because no Supreme Court case establishes that an instruction such as CALJIC 17.41.1 violates an existing constitutional right.").

**C. Ground Three**

Petitioner argues that his trial counsel was ineffective for failing to request a competency hearing and failing to assert a mental defense; Petitioner contends that counsel's decisions were not based on a reasonable investigation of Petitioner's mental health.   In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  *Strickland,* 466 U.S. at 688; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different."  *Id.* at 694.  A court evaluating an ineffective assistance of counsel claim does not need to address both components of the test if the petitioner cannot sufficiently prove one of them.  *Id.* at 697; *Thomas v. Borg*, 159 F.3d 1147, 1151-52 (9th Cir. 1998).

In order to provide adequate representation of a criminal defendant who may suffer from a mental defect, counsel must conduct a reasonable investigation into the defendant's mental health.

1   *See, e.g.*, *Raley v. Ylst*, 470 F.3d 792, 800-801 (9th Cir. 2006) (discussing counsel's obligation to

2   investigate mental health for purposes of ascertaining viability of mental defenses at trial).

3   Counsel's investigation must permit informed decisions about how best to represent the client.

4   *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994).  Reasonable investigation of a defendant's

5   mental health includes, at a minimum, discussing mental health issues with the defendant and

6   reviewing pertinent medical records.  *See Jennings v. Woodford*, 290 F.3d 1006, 1013-14 (9th Cir.

7   2002) (discussing counsel's failure to investigate which amounted to deficient performance).  The

8   thoroughness of counsel's investigation and overall performance are measured in light of the

9   prevailing  professional norms at the time of counsel's representation.  *Wiggins v. Smith*, 539 U.S.

10   510, 523 (2003) (citing *Strickland*, 466 U.S. at 688).  Accordingly, state law in place at the time of a

11   defendant's trial is relevant to a federal court's determination of the prevailing legal norms against

12   which counsel's conduct must be measured.  *See, e.g., id.* at 523-24(evaluating counsel's conduct in

13   light of the state of the law in place at the time of defendant's trial*); Jennings*, 290 F.3d at1015-16

14   (same).

15       Because the Court could not determine the reasonableness of Petitioner's trial counsel's

16   actions based on the record before the State court, on March 14, 2008, the Court ordered Petitioner's

17   trial counsel, Michael Lukehart, to submit an affidavit "describing what, if any, investigation trial

18   counsel made into Petitioner's mental condition."  (Doc. 44 at 2).  Lukehart's declaration stated that

19   he "acquired and reviewed [Petitioner's] medical records," but did not specifically identify which

20   records were reviewed or what facts were disclosed by the records that supported his decision to

21   forego a mental defense. (Doc. 49 at 3).  Accordingly, the Court's order scheduling the evidentiary

22   hearing in this action directed the parties to present evidence on the issue of Lukehart's investigation

23   into Petitioner's mental condition. (Id. at 4).

24       At the evidentiary hearing on April 27, 2009, Lukehart recounted his procedure for assessing

25   a client's mental health.  (Ev. Hearing Trans. at 19).  Lukehart testified that the first step he took

26   when he received a new client was to read the files available at the public defender's office,

27   including any files for previous cases that the public defender had handled for the client.  (Id. at 19).

28

1   Lukehart would then speak with other attorneys in the public defender's office who had interacted

2   with the client. (Id. at 20). Lukehart recalled that he reviewed Petitioner's file concerning an

3   unrelated conviction for which Petitioner was being sentenced the day after the arraignment on

4   Lukehart's case. (Id. at 20, 22). Lukehart remembered speaking with two attorneys in the public

5   defender's office, Kelly Fowler and John Ulman, who had conducted preliminary interviews with

6   Petitioner prior to Lukehart's initial meeting with Petitioner. (Id. at 27, 45). Lukehart stated that

7   nothing in his discussions with Ms. Folwer "raised an issue in regards to [Petitioner's] mental

8   health." (Id. at 28). In fact, Ms. Folwer, the attorney initially assigned to Petitioner's case, described

9   Petitioner as "fairly articulate and savvy on the law." (Doc. 56 at 2). Lukehart testified that Mr.

10  Ulman did not raise any issues about Petitioner's mental health. (Ev. Hearing Trans. at 28, 45).

11  Lukehart also spoke with two investigators, Patty Buckley and Grinnel Griffin, who interacted with

12  Petitioner prior to trial. (Id. at 21, 44). Neither Ms. Buckley nor Ms. Griffin raised any concerns

13  about Petitioner's competency. (Id. at 45).[2]

14      Lukehart testified that it was his practice to employ a mental status evaluation "checklist"

15  during his initial meeting with a client. (Id. at 20). Lukehart's checklist included an assessment of

16  the client's reactions to Lukehart's questioning and "whether the client seem[ed] to know what's

17  going on." (Id.). Lukehart would also ask the client whether they had past mental health

18  commitments and whether the client was ever placed in "special ed." (Id.). Had Lukehart harbored

19  any "real concerns" about the Petitioner's mental health after the initial interview, he would have

20  retained a mental health professional pursuant to his custom and practice. (Id. at 21). Lukehart met

21  with Petitioner several times after the initial interview. During their meetings, Petitioner actively

22  participated with counsel in preparing in his defense. Petitioner gave Lukehart the names of

23  potential alibi witnesses and was adamant that he would testify at trial. (Id. at 33-34). At one

24

25

26  [2] Prior to arriving at the public defender's office, Ms. Buckley served as an assistant coroner and was in charge of the
    coroner's conservatorship project. (Id. at 21). Lukehart testified that Ms. Buckley was an "in-house resource" that he would
    utilize before retaining a alienist because of her experience with mental disabilities. (Id.). Ms. Griffin had investigated
27  another matter for Petitioner in an unrelated action and was familiar with Petitioner and his family. (Id. at 44). Ms. Griffin
    took a special interest in Petitioner's case and wanted Petitioner to be treated well. (Id. at 44-45). Given their backgrounds,
28  the fact that neither Ms. Buckley nor Ms. Griffin expressed any doubts about Petitioner's competency is persuasive evidence
    that Petitioner was in fact competent.

1  meeting, Petitioner asked Lukehart for a copy of the transcript of Petitioner's preliminary

2  examination.  (Id. at 36).

3       Lukehart testified that he reviewed several different sets of medical records pertaining to

4  Petitioner's physical and mental health.  Lukehart subpoenaed Petitioner's records from Kern

5  Medical Center prior to trial; in fact, before receiving the subpoenaed records, Lukehart physically

6  went to Kern Medical Center and reviewed records concerning a gunshot wound in Petitioner's leg

7  in 2000 and a drug-induced psychotic episode in 1999.  (Id. at 37-39).  In addition to reviewing the

8  medical documents from Kern Medical Center, Lukehart also reviewed records from Napa State

9  Hosptial relating to Petitioner's commitment after he was found not competent to stand trial in early

10 1999.  (Id. at 40).  Lukehart recalled that the Napa State Hospital records indicated that Petitioner

11 had become competent to stand trial after approximately five months of observation and treatment.

12 (Id.).  Lukehart testified that the records produced at the evidentiary hearing did not include all of

13 the records he reviewed concerning Petitioner's mental health.  (Id. at 39).  In addition to the

14 conclusory documents produced at the evidentiary hearing, Lukehart recalled reviewing "various and

15 sundry examination reports...and progress reports" prepared by psychologists, psychiatrists, social

16 workers, and other reports appended to the documents produced at the evidentiary hearing.  (Id. at

17 40).  Lukehart discussed Petitioner's 1999 incompetency finding with Petitioner and got the

18 impression that Petitioner was satisfied with the result of the 1999 proceedings.  (Id. at 41).

19                    **1. Counsel's Decision to Forego a Competency Hearing**

20
21       Counsel's decision to forego a competency hearing must be evaluated in light of the standard

22 Petitioner would have had to meet in order to establish incompetency.  California law defines a

23 mentally incompetent defendant as a person who, as a result of mental disorder or developmental

24 disability, "is unable to understand the nature of the criminal proceedings or to assist counsel in the

25 conduct of a defense."  CAL. PEN. CODE § 1367(a).  The competency standard set forth in California

26 Penal Code section 1367 is consistent with the competency standard established by the Due Process

27 Clause of the United States Constitution.  *See, e.g., Drope v. Missouri,* 420 U.S. 162, 171 (1975) ("a

28 person whose mental condition is such that he lacks the capacity to understand the nature and object

of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial"); *see also Nguyen v. Garcia*, 477 F.3d 716, 724 (9th Cir. 2007) (equating competency standard articulated in section 1367 with the standard applied by the Supreme Court in *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993)). The mental capacity needed for a defendant to be competent to stand trial is relatively low. *See Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003) ("to be competent to stand trial, a defendant must demonstrate an ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him.").

Pursuant to prevailing legal norms in place at the time of Petitioner's trial in 2002, counsel had a duty to request a competency hearing if he harbored "substantial doubt" about Petitioner's competency to stand trial. *See People v. Farnam*, 28 Cal.4th 107, 187 (Cal. 2002) (rejecting claim that counsel was ineffective for failing to raise competency issue where "nothing in the record raised a substantial doubt as to competency"); *People v. Rodrigues*, 8 Cal.4th 1060, 1108 (Cal. 1994) ("[b]ecause the record does not demonstrate a substantial doubt as to defendant's competency, we reject defendant's related claims that his counsel was ineffective in failing to request a competency hearing" ); *see also Davis*, 384 F.3d at 646-47 (rejecting ineffective assistance claim where record did not demonstrate "substantial evidence" of incompetence). The Ninth Circuit has explained that, "[a]lthough no particular facts signal a defendant's incompetence, suggestive evidence includes the defendant's demeanor before the trial judge, irrational behavior of the defendant, and *available* medical evaluations of the defendant's competence to stand trial." *Williams v. Woodford*, 306 F.3d 665, 702 (9th Cir. 2002) (emphasis added).

Petitioner contends that his trial counsel's performance was constitutionally deficient because counsel's decision to forego a competency hearing was not supported by a reasonable investigation of Petitioner's mental health. Specifically, Petitioner contends that counsel "fail[ed] to gather medical records and [failed] to refer Petitioner for a comprehensive neurological and psychiatric examination by experts qualified on the subject of developmental disabilities and competency to stand trial." (Pet. at 15; *see also* Pet. Post Ev. Hearing Brief at 9). Petitioner's contention that

1    Lukehart "failed to gather medical records" is contrary to the record.  At the evidentiary hearing,

2    Lukehart testified that he reviewed numerous medical documents pertaining to Petitioner's mental

3    health, including medical records from Kern Medical Center concerning a drug-induced psychotic

4    episode in 1999, and, most importantly, records from Napa State Hospital documenting Petitioner's

5    restoration of competency that same year.  (Ev. Hearing Trans. at 40).  Lukehart further testified that

6    the records produced at the evidentiary hearing did not include all of the records he reviewed during

7    his investigation of Petitioner's mental health.  (Id. at 39).

8            Petitioner's only colorable claim is that Lukehart was deficient in failing to have Petitioner

9    re-examined by a mental health professional. (Pet. Post Ev. Hearing Brief at 17).  The Court's review

10   of relevant authority reveals that, ordinarily, where counsel harbors doubt as to her client's

11   competency, counsel should consult a mental health professional.  *See, e.g., People v. Frye*, 18

12   Cal.4th 894, 949-52 (Cal. 1998) (counsel hired expert to conduct evaluation of defendant before

13   trial); *Rodrigues*, 8 Cal.4th at 1107-10 (same);  *McPeters*, 2 Cal.4th at 1168-69; *People v. Weaver*,

14   26 Cal. 4th 876, 953 (Cal. 2001) (same).  However, in some instances, counsel may reasonably

15   conclude that there are insufficient grounds to request a competency hearing on the basis of her

16   interactions with the client.  *See People v. Davis*, 10 Cal.4th 463, 526-27 (Cal. 1995) (despite

17   defendant's bizarre behavior, counsel reasonably decided to forego a competency hearing based on

18   defendant's cooperation with counsel and participation in trial);[3] *see also Strickland*, 466 U.S. at

19   690-91 (decisions based on a less-than-complete investigation are reasonable to the extent that

20   reasonable professional judgments support the limitations counsel placed on the investigation).

21           The Court cannot say that Lukehart's investigation into Petitioner's competency was

22   constitutionally deficient.  Although Lukehart could have conducted a more complete investigation

23   by retaining a mental health professional, Lukehart's decision to limit his investigation of

24   Petitioner's competency as he did constituted a reasonable professional judgment.  Lukehart

25

26

27   _____

     [3] The defendant in *Davis* alleged that counsel was ineffective for failing to request a competency hearing during the
     defendant's penalty phase, during which the defendant began to act erratically and refused to enter the courtroom.  *Id.* at 526.

28   Counsel informed the court that the defendant's conduct might warrant a competency hearing, but subsequently decided such
     a hearing was unnecessary. *Id*.  Counsel did not consult a mental health expert before reaching this conclusion. *Id*.

1   provided three legitimate reasons for his decision to forego a mental health evaluation before trial:

2       First, I had relatively recent evaluations from the State Hospital as to Mr. Shotwell's
3       mental state when he's not under the influence of drugs. That was the return and the
        various sundry reports that came with it. That wasn't that old.
4
5       Secondly, our own observations in dealing with Mr. Shotwell, and the history, he did
        not give any indication that he didn't understand. It wasn't difficult to talk to him. I
6       just, you know, I don't get reports unless I see that my client's having difficulty.

7       Third, the – if you have a client, and this is a client management issue in these trial
        situations, the clients are -- Mr Shotwell's fairly sophisticated about the system and
8       he's not stupid. And if you come and every day he's insisting I wasn't there, get my
        alibi witnesses. Show that I couldn't run away from the scene. It couldn't have been
9       me, on and on and on, and every time you talk to him, he's adamant and then one day
        you walk up and say oh, by the way, I want to have a doctor come talk to you about
10      your mental health because maybe we'll be running a defense on the mental state,
        you've just guaranteed yourself a huge client relations problem right there because
11      your client's going to clam up on you and you're not going to be able to communicate
        or effectively represent him from that point.
12

13  (Ev. Hearing Trans. at 71-72).  In light of the information contained in the documents from Napa

14  State Hospital, the lack of any doubt as to Petitioner's competency expressed by two other public

15  defenders and two investigators, and Lukehart's own assessment of his Petitioner's ability to

16  comprehend the proceedings and to participate therein, Lukehart's decision to forego further

17  investigation into Petitioner's competency was reasonable.  Lukehart had sufficient information to

18  permit him to reasonably conclude that further investigation of Petitioner's mental health would not

19  produce evidence sufficient to raise a "substantial doubt" about Petitioner's competency.  *See People*

20  *v. McPeters*, 2 Cal.4th 1148, 1169 (Cal. 1992) *superseded on other grounds by Verdin v. Superior*

21  *Court,* 43 Cal.4th 1096 (Cal. 2008) (previous finding of incompetency held insufficient to raise a

22  "substantial doubt" as to the defendant's competency at the time of trial where subsequent evaluation

23  concluded defendant's competency had been restored and where the defendant's interactions with

24  counsel did not cause counsel to harbor a bona fide doubt in his client's competency).  In *McPeters*,

25  the California Supreme Court noted that neither petitioner's counsel nor the trial court had any

26  doubts about the defendant's competency at the time of trial and concluded that a previous finding of

27  incompetency was insufficient to support the defendant's ineffective assistance of counsel claim.  *Id.*

28  at n.1; *accord People v. Weaver*, 26 Cal. 4th 876, 953 (Cal. 2001) (rejecting ineffective assistance

claim where counsel *opposed* competency hearing because no substantial evidence established a doubt as to defendant's competency).   The California Supreme Court stated "in view of the stale character of the [earlier incompetency finding], defendant fails to show its pertinence to the question of defendant's competence at the time of the hearing....[u]nder these circumstances...[there is no] basis for a claim that defense counsel was ineffective." *Id.*

Judged against the prevailing legal norms applicable at the time of Petitioner's trial, Lukehart's decision not to refer Petitioner for a mental health examination in connection with his competency to stand trial was reasonable.  Petitioner's previous incompetency finding had become stale by the time Lukehart undertook representation of Petitioner, especially in light of the information gleaned from Lukehart's review of Petitioner's medical records, discussions with other members of Petitioner's defense team, and his own interactions with Petitioner.  Accordingly, Petitioner is not entitled to relief on his claim that his counsel was ineffective in failing to further investigate Petitioner's competency or to request a competency hearing.

### 2.  Decision to Forego a Mental Defense

The fact that Lukehart's investigation of Petitioner's competency to stand trial was reasonable does not necessarily mean that the Lukehart's investigation of potential mental defenses was also reasonable.  *See People v. Ledesma*, 729 P.2d 839, 872-73 (Cal. 1987) (counsel was prejudicially ineffective for failure to investigate mental illness evidence despite expert's report stating that defendant was competent to stand trial);[4] *see also Doe v. Woodford*, 508 F.3d 563, 569 (9th Cir. 2007) (noting possible distinction between investigation required with respect to competency and mental defenses); *Jennings v. Woodford*, 290 F.3d 1006, 1013-14 (9th Cir. 2002) (psychiatrists finding that defendant was competent to stand trial did not justify attorney's failure to investigate possible mental defenses).  It is axiomatic that a criminal defendant may have sufficient cognitive abilities to be competent to stand trial despite the fact that he suffered from a culpability-reducing mental defect at the time he committed his crime.

---

[4] *Ledesma* is particularly instructive on this point, as Lukehart's conduct must be judged against the prevailing legal norms applicable in California at the time of Petitioner's trial. *Wiggins*, 539 U.S. at 523-24.

1    Relevant authority suggests that Lukehart's investigation of Petitioner's mental health may

2  have fallen below applicable professional norms with respect to assessing potential mental defenses.

3  Lukehart did not consult a mental health professional concerning the impact Petitioner's mental

4  health and substance abuse might have had on Petitioner's *mens rea* at the time of his offense.  *See*

5  *Jennings*, 290 F.3d at 1013 (counsel's failure to appoint experts to evaluate defendant's mental state,

6  *inter alia*, supported finding that counsel's investigation into mental defenses was constitutionally

7  deficient); *Bloom v. Calderon*, 132 F.3d 1267, (9th Cir. 1997) (holding that counsel was ineffective

8  where he failed, *inter alia*, to retain a mental health expert until days before trial); *Seidel v. Merkle*,

9  146 F.3d 750, 756 (9th Cir. 1998) (noting failure to obtain "mental or psychiatric evaluations" of

10  defendant); *see also In re Scott*, 20 Cal. 4th 783, 825 (Cal. 2003) (finding that counsel's investigation

11  into mental defenses was "minimal" where counsel consulted two mental health experts for the

12  purpose of ascertaining competency and "researched" possible defense based on drug Petitioner was

13  using); *In re Fields,* 51 Cal.3d 1063, 1074-75 (Cal. 1990) (counsel's investigation adequate to meet

14  "minium standards" where counsel caused defendant to be examined by two psychiatrists); *People v.*

15  *Williams*, 44 Cal. 3d 883, 944 (Cal. 1988) (investigation was reasonable where counsel based

16  decision to curtail investigation on two psychiatrists' evaluations of defendant); *Ledesema*, 43 Cal.

17  3d at 223-24 (finding ineffective assistance despite the fact that counsel caused appointment of

18  psychiatrist to examine defendant for purposes of establishing competency).  Nor did Lukehart

19  interview family members to discuss Petitioner's history of mental illness, drug use, or his demeanor

20  during the days surrounding the offense.  *See Seidel*, 146 F.3d at 756 (noting counsel's failure to

21  interview witnesses regarding Petitioner's mental state);  *Jennings*, 290 F.3d at 1013 (noting failure

22  to interview defendant's former wife or others who had observed defendant under the influence of

23  drugs); *Ledesema*, 43 Cal. 3d at 194-95; 223-24 (finding ineffective assistance where counsel failed,

24  *inter alia*, to interview family members who would have divulged information regarding defendant's

25  traumatic childhood, lifelong drug abuse, and mental condition during the general period

26  surrounding the offense).

27    Lukehart's investigation was not as deficient as the investigations held unreasonable in cases

28  such as *Jennings*, *Bloom*, *Siedel*, or *Ledesema*, as Lukehart did take the investigative step of

1  reviewing various mental health records during his pre-trial preparations.  However, the mere fact

2  that Lukehart reviewed Petitioner's mental health records does not render his investigation

3  reasonable, as Petitioner's records put Lukehart on notice that there were mental health and

4  substance abuse issues that may have implicated potential mental defenses.   Under such

5  circumstances, case law suggests that Lukehart should have at least contacted a mental health

6  professional to discuss the interplay between Petitioner's mental health issues, drug use, and his

7  ability to form the *mens rea* required to sustain a murder conviction.  *See, e.g., Jennings*, 290 F.3d at

8  1013; *Ledesema*, 43 Cal. 3d at 223-24.   Nevertheless, although Lukehart's investigation of possible

9  mental defenses was less than diligent, whether his investigation was constitutionally unreasonable is

10  a close question.  Assuming *arguendo* that Lukehart's investigation was constitutionally deficient,

11  the Court finds that Petitioner was not prejudiced by Lukehart's conduct and therefore is not entitled

12  to relief.

13       In order to demonstrate that he was prejudiced by his counsel's deficient performance,

14  Petitioner must establish a reasonable probability that, but for his counsel's unprofessional error, the

15  outcome of Petitioner's trial would have been more favorable.  *See, e.g., Styers v. Schriro*, 547 F.3d

16  1026, 1030 n.1 (9th Cir. 2008) (citation omitted).  Accordingly, the Court must evaluate the

17  probability that evidence uncovered through a diligent investigation of potential mental defenses

18  would have benefitted Petitioner at trial.

19       Under California law, conspiracy is a specific intent crime requiring both an intent to agree or

20  conspire and a further intent to commit the target crime or object of the conspiracy.  *E.g., People v.*

21  *Cortez*, 18 Cal. 4th 1223, 1232 (Cal. 1998).  Similarly, the crime of attempted murder is a specific

22  intent crime under California law.  *E.g., People v. Superior Court*, 41 Cal.4th 1, 7 (Cal. 2007).

23  Conceivably a mental defense could have benefitted Petitioner by negating the intent element

24  necessary to sustain his conspiracy and attempted murder convictions under the theory of

25  "diminished actuality."  Alternatively, Petitioner might have been able to obtain a not guilty by

26  reason of insanity verdict.

27  ///

28

1   However, due to the evidence presented against Petitioner at trial, it is extremely unlikely that either

2   a defense of diminished actuality or insanity would have been accepted by the jury.

### a. Insanity Defense

4   The record reveals that Petitioner's probability of advancing a successful insanity defense to

5   was essentially nil.  The test of legal insanity in California:

is the rule in *M'Naghten's Case* as adopted by the electorate in June 1982 with the
passage of Proposition 8. That  measure added section 25, subdivision (b), which
provides: "In any criminal proceeding . . . in which a plea of not guilty by reason of
insanity is entered, this defense shall be found by the trier of fact only when the
accused person proves by a preponderance of the evidence that he or she was
incapable of knowing or understanding the nature and quality of his or her act and of
distinguishing right from wrong at the time of the commission of the offense."
Despite the use of the conjunctive "and" instead of *M'Naghten's* disjunctive "or," this
court has interpreted the statute as recognizing two distinct and independent bases on
which a verdict of not guilty by reason of insanity might be returned.

*People v. Lawley*, 27 Cal. 4th 102, 169-70 (Cal. 2002) **(**citations omitted).  Unlike the defense of

diminished actuality, an insanity defense cannot be based on a defendant's drug use:

[California Penal Code]Section 25.5 provides that if an accused's insanity is caused
solely by abuse of or addiction to intoxicating substances, then the insanity defense is
not available to him or her. This statute makes no exception for brain damage or
mental disorders caused solely by one's voluntary substance abuse but which persists
after the immediate effects of the intoxicant have dissipated. Rather, it erects an
absolute bar prohibiting use of one's voluntary ingestion of intoxicants as the sole
basis for an insanity defense, regardless whether the substances caused organic
damage or a settled mental defect or disorder which persists after the immediate
effects of the intoxicant have worn off.

*People v. Robinson*, 72 Cal. App. 4th 421, 427 (Cal. Ct. App. 1999).

Evidence that a defendant acted out of anger and vengefulness cuts against a defendant's

assertion of insanity.  *See Lawley*, 27 Cal. 4th at 170 (noting that "the evidence tended strongly to

show that defendant acted out of anger and vengefulness rather than an insane delusion**"**).  Here, the

evidence adduced at Petitioner's trial indicates that Petitioner's motive for his crimes was retaliation

for the murder of his nephew two days before the victim's shooting.

///

 ///

Similarly, evidence that a defendant planned and deliberated his offense also discredits the assertion of an  insanity defense.  *See People v. Coddington*, 23 Cal. 4th 529, 627-28 (Cal. 2000).[5] Evidence presented during Petitioner's trial reflects a degree of planning and calculation that belies the notion that Petitioner was legally insane at the time he formed the conspiracy or at the time he attempted to kill the victim.  According to the victim's testimony, Petitioner went to the victim's home, knocked on his door, and gave the false name of one of the victim's friends in order to lure the victim out of his residence.  (Lod. Doc. 9 at 49).  Petitioner and his accomplis then hid on the side of the house and waited for the victim to come outside.  (Id. at 63).

In light of the evidence presented at trial, it is extremely unlikely that an insanity defense would have established that at the time he formed the conspiracy to murder the victim, or that at the time he shot at the victim, Petitioner was "so deranged and diseased mentally" that he did not "know the nature or quality of the act, or if he did know it, that he did not know he was doing what was wrong."  *See People v. Skinner*, 39 Cal.3d 765, 773; 781-82 (Cal. 1985) (citations omitted) (discussing standard for legal insanity in California).   This is especially true given that Petitioner would have born the burden of proof of establishing that he was legally insane at the times relevant to his conviction.  *E.g. Lawley*, 27 Cal. 4th at 169-70.  Because of the onerous legal standard for establishing insanity in California, the fact that Petitioner would have born the burden of proof in establishing insanity, the evidence of Petitioner's retaliatory motive, Petitioner's planning and execution of the offense, and the fact that Petitioner's substance abuse could not have been used in support of an insanity defense, there is no reasonable probability that Petitioner would have received a more favorable verdict had Lukehart more thoroughly investigated, and ultimately presented, an insanity defense.

---

[5] The Court notes that in some instances, a defendant's planning of an offense might not undercut an insanity defense.  For example, if the victim carefully planned his crime, but was operating under such a delusion that he subjectively believed he was acting pursuant to "God's will" and therefore did not appreciate the wrongfulness of his act, an insanity defense might still be accepted by a rational jury.  *See, e.g., People v. Hernandez*, 22 Cal.4th 512, 517-18 (Cal. 2000) (discussing defendant's crime and insanity defense based on delusion that he was god's messenger).  Here, however, there is not even the slightest evidence indicating that Petitioner's mental health problems, described by Petitioner's counsel and medical evidence contained in the current record as "mild mental retardation" and a "personality disorder," (Pet. Post Hearing Brief at 15) were capable of leading to such sever delusions that Petitioner could have sustained an insanity defense in light of the evidence adduced at trial.

1

        _____b. Diminished Actuality

2

_____Petitioner could have benefitted from a defense of "diminished actuality" if Petitioner could

3

have provided evidence that due to his mental illness or voluntary intoxication, he did not harbor the

4

intent necessary to form a conspiracy or to attempt to kill the victim.  *E.g., People v. Mejia-Lenares,*

5

135 Cal. App. 4th 1437, 1450 (Cal. Ct. App. 2006).  "The concept of diminished actuality is

6

circumscribed, however."  *Id.*  In 1981, the California legislature abolished the defense of

7

"diminished capacity," pursuant to which  evidence which tended to show a defendant lacked the

8

mental capacity to form the requisite mental state was admissible in the guilt phase of a criminal

9

trial.  *Id.* at 111.  Thus, since 1981, criminal defendants in California have been prohibited from

10

offering evidence of "an accused person's intoxication, trauma, mental illness, disease, or defect to

11

show or negate *capacity* to form the particular purpose, intent, motive, malice aforethought,

12

knowledge, or other mental state required for the commission of the crime charged."  *Id.* at 1112

13

(emphasis added).  Accordingly, Petitioner could not have made the argument that due to his mild

14

mental retardation, personality disorder, and history of drug use, he lacked the general capacity to

15

form the requisite intent to form a conspiracy or attempt murder.  Rather, under the defense of

16

"diminished actuality," Petitioner would have been limited to producing evidence which

17

demonstrated that he actually did not form the requisite intent at the time he committed his offenses.

18

*E.g. People v. Wright,* 35 Cal. 4th 964, 982 (Cal. 2005) (Brown, J., Concurring) (defining defense

19

"diminished capacity" as "that nonsensical phrase being judicial shorthand for the actual lack of a

20

requisite mental state, due to an abnormal mental condition").  Petitioner's diminished actuality

21

defense would have been further constrained by California Penal Code section 29, which provides:

22

        In the guilt phase of a criminal action, any expert testifying about a defendant's mental
        illness, mental disorder, or mental defect shall not testify as to whether the defendant
        had or did not have the required mental states, which include, but are not limited to,
        purpose, intent, knowledge, or malice aforethought, for the crimes charged. The
        question as to whether the defendant had or did not have the required mental states
        shall be decided by the trier of fact.

23

24

25

26

CAL. PEN. CODE § 29.

27

///

28

1  Petitioner's chances of convincing the jury– with the testimony of a mental health expert

2  retained by the defense– that he lacked the requisite intent to form a conspiracy or to kill the victim

3  were extremely slim.  As noted above, Petitioner's expert would not have been able to offer an

4  opinion on the issue of whether Petitioner harbored the requisite levels of intent at the time of the

5  offense.  *Id.*  Rather, the expert would have only been able to discuss Petitioner's mental health

6  factors and to testify generally about the effect of mental illness and intoxication on a person's *mens*

7  *rea*.  Any expert testimony offered by Petitioner would have had to overcome the victim's testimony,

8  which does not provide any support for the notion that, at the time of the offense, Petitioner was

9  suffering from mental illness or intoxication such that he could not harbor the intent necessary to

10  commit the crimes of conspiracy and attempted first degree murder.  To the contrary, the victim's

11  testimony suggests strongly that Petitioner and his co-conspirator acted with a degree of calculation,

12  planning, and coherence that belies the notion that Petitioner was so delusional or intoxicated that he

13  could not intend to conspire or to kill.

14  According to the victim, Petitioner and his accomplice went to the victim's home, knocked

15  on his door, and gave the false name of one of the victim's friends in order to lure the victim out of

16  his residence.  (Lod. Doc. 9 at 49).  Petitioner and his accomplice then hid on the side of the house

17  and waited for the victim to come outside.  The evidence demonstrates that Petitioner had pulled his

18  gun out *before* the victim came out of his house.  (Id. at 66).  The victim's testimony thus strongly

19  evinced a conspiracy to kill.  To prove a conspiracy in California, the prosecution need not show that

20  the parties met and expressly agreed to commit a crime.  *People v. Cooks*, 141 Cal. App. 3d 224, 74-

21  75 (Cal. Ct. App. 1983) (citing *People v. Calhoun* 323 P.2d 427 (Cal. 1958)).  Evidence is sufficient

22  to sustain a conspiracy conviction where it "supports an inference that the parties positively or tacitly

23  came to a mutual understanding to commit a crime."  *Cooks*, 141 Cal.App.3d at 275 (citing *People v.*

24  *Cockrell* 408 P.2d 116 (1965)).   "The existence of a conspiracy may be inferred from the conduct,

25  relationship, interests, and activities of the alleged conspirators before and during the alleged

26  conspiracy."  *Cooks*, 141 Cal.App.3d at 275 (citations omitted).  The crime of conspiracy can be

27  committed whether the conspirators fully comprehended its scope, whether they acted together or in

28  separate groups, or whether they used the same or different means known or unknown to them.  *Id.*

1    (citations omitted).   Viewed in light of the applicable legal standards, it is not reasonably likely that

2    any evidence offered by a mental health expert in support of Petitioner's diminished actuality

3    defense would have altered the jury's conspiracy verdict.

4         With respect to Petitioner's attempted first degree murder conviction, the prosecution needed

5    to demonstrate a deliberated, premeditated, and malicious attempt to kill the victim.  *See, e.g.,*

6    *People v. Saille*, 54 Cal. 3d 1103, 1114 (Cal. 1991) (discussing malice element of first degree

7    murder).  Petitioner contends that a diminished actuality defense could have negated the

8    premeditation element necessary to sustain an attempted first degree murder conviction.  (Pet. Post

9    Ev. Hearing Brief at 25).  However, as discussed above, the evidence produced at trial strongly

10   evinced a conspiracy to kill the victim; this evidence also established deliberation and premeditation.

11    *See, e.g., People v. Cortez*, 18 Cal. 4th 1223, 1232 (Cal. 1998) ("mental state required for conviction

12   of conspiracy to commit murder necessarily establishes premeditation and deliberation of the target

13   offense of murder.").

14        Petitioner also argues that a diminished actuality defense could have negated the malice

15   element of attempted murder.  (Pet. Post Ev. Hearing Brief at 25).  Malice is defined as "a deliberate

16   intention unlawfully to take away the life of a fellow creature."  *E.g. Saille*, 54 Cal. 3d at 1114.

17   Here, the victim's testimony clearly reveals an unlawful intent to kill on Petitioner's part.  When the

18   victim saw Petitioner, Petitioner smiled and said "what's up Chris" (the victim's actual name); at this

19   point, Petitioner already had his weapon in hand, and was attempting to conceal it by keeping his

20   hand low by his side.  (Id. at 56; 66).  Petitioner pointed his weapon at the victim's face and fired

21   multiple times.  (Id.).   After shooting at the victim's head and torso, Petitioner followed the

22   wounded victim onto his porch as he retreated back into his home.  (Id. at 66).  The victim recalled

23   seeing a hand with a gun come through the doorway to his home before the door was force closed,

24   forcing his assailant back.  (Id.).  "Once the trier of fact finds a deliberate intention unlawfully to kill,

25   no other mental state need be shown to establish malice aforethought."  *Mejia-Lenares*, 135 Cal.

26   App.4th at 1451.  Petitioner's contention that "a properly prepared expert could have assisted

27   counsel in presenting a defense that Petitioner was guilty, at most, of attempted voluntary

28

1  manslaughter" is incorrect.  (Pet. Post Ev. Hearing Brief at 25).  "[T]he elimination of the diminished

2  capacity defense effectively eliminated the middle option of voluntary manslaughter in a diminished

3  actuality case."  *Wright,* 35 Cal. 4th at 978-79 (Brown, J., Concurring) (citing *Saille,* 54 Cal.3d at

4  1113–1117).

5      In light of the constraints that would have been placed on Petitioner's expert testimony

6  pursuant to California Penal Code section 29, the evidence presented which supported the inference

7  that the Petitioner conspired to kill the victim, the victim's testimony regarding Petitioner's

8  demeanor during the offense, the evidence of motive and planning in the record, and the limited

9  scope of the "diminished actuality defense" in California, there is no reasonable probability that

10  Petitioner would have received a more favorable verdict had Lukehart more thoroughly investigated,

11  and ultimately presented, a diminished actuality defense.

12  **_____D.  Ground Four**

13

14  _____Petitioner argues that his Sixth and Fourteenth Amendment rights were violated when the

15  Kern County Public Defender's Office represented him and Donmac Roberts simultaneously.

16  Petitioner claims that the representations created an actual conflict of interest because Petitioner was

17  a percipient witness to the murder of Tommy Welch and Roberts was charged with the murder.

18  Petitioner argues that, absent a conflict, his counsel could have developed a manslaughter defense

19  and that defense counsel for Roberts had an incentive to attack Petitioner's credibility which was

20  adverse to Petitioner's defense being handled by the same office.

21  _____This claim was presented in a petition for writ of habeas corpus to the California Supreme

22  Court, which was summarily denied on January 18, 2006.  (Lod. Docs. 7-8; Answer at 3.)  When the

23  state court reaches a decision on the merits but provides no reasoning to support its conclusion, we

24  independently review the record to determine whether the state court clearly erred in its application

25  of Supreme Court law.  *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).  However, although

26  we independently review the record, we still defer to the state court's ultimate decision.  *Id.*

27      "[T]o demonstrate a violation of his Sixth Amendment rights, a defendant must establish that

28  an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446

U.S. 335, 350 (1980).  "[T]o show adverse effect, a defendant need not demonstrate prejudice-that the outcome of his trial would have been different but for the conflict-but only that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *U.S. v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (quotation marks omitted).

The state court did not clearly err in its application of Supreme Court law, as Petitioner has not demonstrated any actual conflict on the part of his trial counsel.  The only defense strategy or tactic that Petitioner identifies that might have been pursued but was not is a manslaughter defense based on the argument that Petitioner acted upon provocation, without malice aforethought. (Amended Petition at 28.)  Petitioner has made no showing, however, that the Public Defender's simultaneous representation of Roberts was inherently in conflict with counsel asserting a manslaughter defense on behalf of Petitioner or that counsel's failure to make such an argument was based on the Public Defender's representation of Roberts rather than the fact it would have been inconsistent with Petitioner's alibi defense.  Petitioner's other claim of conflict, that another public defender may have been forced to undermine his credibility in the defense of Roberts, also does not demonstrate any actual conflict, as there is no showing that Petitioner's own counsel had any interests or loyalties adverse to Petitioner or that counsel's performance was otherwise affected. *See U.S. v. Trevino*, 992 F.2d 64, 66 (5th Cir. 1993) ("Typically, the potential for a multiple representation conflict exists when codefendants are represented by the same attorney.  The potential for such conflicts, however, does not necessarily exist when, as in this case, codefendants are represented by different attorneys, albeit in the same public defender office.").  Further, there is no evidence demonstrating any such attack on Petitioner's credibility actually took place.

**E.  Ground Five**

Petitioner argues that his trial counsel was ineffective in failing to call witnesses who could have supported his claim that he was not present at the scene of the crime.

This claim was presented in a petition for writ of habeas corpus to the California Supreme Court, which was summarily denied on January 18, 2006.  (Lod. Docs. 7-8; Answer at 3.)  When the state court reaches a decision on the merits but provides no reasoning to support its conclusion, we

1   independently review the record to determine whether the state court clearly erred in its application

2   of Supreme Court law. *Pirtle*, 313 F.3d at 1167. However, although we independently review the

3   record, we still defer to the state court's ultimate decision. *Id*. As stated above, to show ineffective

4   assistance of trial counsel, Petitioner must show that his counsel's performance was deficient and

5   that the deficiency resulted in prejudice. *Strickland*, 466 U.S. at 687.

6   _____The state court did not clearly err in its application of Supreme Court law.  Petitioner

7   identifies two witnesses, Kirk Herghelian and Tasha Walton, that should have been called to support

8   his alibi defense.  Both were contacted by an investigator at the Kern County Public Defender's

9   Office.  (Excerpts of Record, Ex. 2 at 21-22.)  Mr. Herghelian did not know Petitioner, although he

10  thought that Petitioner might be a neighbor across the street that he would see early in the morning

11  when he was going to work.  Mr. Herghelian could not recall seeing the neighbor on the morning of

12  the Davis shooting, but he agreed to check his records at work to try to refresh his recollection.

13  (Excerpts of Record, Ex. 2 at 21.)  Tasha Walton, who rented a room in the same house as Petitioner,

14  stated that she recalled Petitioner being at home in Fresno the week of the Davis shooting because

15  she would tell him each day that she was leaving for work.  Walton stated that she never heard

16  Petitioner say anything about going to Bakersfield during that time.  (Excerpts of Record, Ex. 2 at

17  22.)

18  Petitioner has not demonstrated that there is a reasonable probability that a follow-up

19  interview with the witnesses or calling them at trial would have resulted in a different outcome.  Mr.

20  Herghelian stated that he did not know Petitioner and that he did not recall whether he saw Petitioner

21  on the morning of the Davis shooting.  There is no indication that he would have corroborated

22  Petitioner's alibi defense.  Ms. Walton did state that she saw Petitioner in Fresno on the morning of

23  the Davis shooting, but she also stated that he was there each day that week, which contradicted

24  Petitioner's testimony that he was in Bakersfield on November 27.  Given the conflicting accounts,

25  and considering the other evidence implicating Petitioner, including the victim's identification of

26  him as the shooter, Petitioner cannot show prejudice from the failure to call Ms. Walton at trial.

27  ///

28  ///

1                                    **<u>RECOMMENDATION</u>**

2 _____Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

3 DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

4 Respondent.

5 _____This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

6 United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

7 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

8 Within thirty (30) days after being served with a copy, any party may file written objections with the

9 court and serve a copy on all parties.  Such a document should be captioned "Objections to

10 Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

11 filed within ten (10) court days (plus three days if served by mail) after service of the objections.

12 The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

13 parties are advised that failure to file objections within the specified time may waive the right to

14 appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

15 <u>IT IS SO ORDERED.</u>

16 **Dated:      March 12, 2010              /s/ John M. Dixon**
                                    UNITED STATES MAGISTRATE JUDGE
17